UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

ALCIDES POLANCO

                                 Plaintiff,

              -against-

THE CITY OF NEW YORK, DEPARTMENT OF CORRECTION COMMISSIONER MARTIN F. HORN, FIDEL GONZALEZ, GREGORY MCLAUGHLIN, MARK SCOTT, PATRICK WALSH, MICHAEL MCKIE, CORRECTION KHALID NELSON, DENISE ALBRIGHT, "NASH", "MILLER", JOHN DOE ##1-10,

                                 Defendants.

------------------------------------------------------------------------ x

JUDGE BERMAN

**'09 CIV 10131**

COMPLAINT AND JURY DEMAND

ECF CASE

RECEIVED
DEC 11 2009
U.S.D.C. S.D.N.Y.
CASHIERS

## PRELIMINARY STATEMENT

1. This is a civil rights action in which plaintiff seeks relief for the violation of his rights secured by 42 USC §§1983 and 1988, the Fourth and Fourteenth Amendments, and the laws and Constitution of the State of New York.

2. The claim arises from a series of incidents culminating in assaults on plaintiff on September 13, 2008, and September 21, 2008, while he was an inmate at Rikers Island, a group of jails operated by the New York City Department of Correction ("D.O.C."). Those assaults involved officers who, acting under color of law, intentionally and willfully conspired with each other and with plaintiff's fellow inmates to subject plaintiff to, among other things, excessive force.

3. Plaintiff seeks monetary damages (special, compensatory, and punitive) against defendants, as well as an award of costs and attorneys' fees, and such other and further relief as

the Court deems just and proper.

## JURISDICTION

4.      This action is brought pursuant to 28 USC §1331 and 42 USC §1983. Pendent party jurisdiction and supplementary jurisdiction over plaintiff's state law claims are asserted.

5.      The amount in controversy exceeds $75,000.00 excluding interest and costs.

6.      Venue is laid within the United States District Court for the Southern District of New York in that Defendant City of New York is located within and a substantial part of the events giving rise to the claim occurred within the boundaries of the Southern District of New York.

## PARTIES

7.      Plaintiff is a citizen of the United States and at all times here relevant was an inmate in the custody of the Department of Correction.

8.      The City of New York ("the City"), is a municipal corporation organized under the laws of the State of New York.

9.      DOC Commissioner Martin Horn ("Horn") was at all times here relevant the Commissioner of D.O.C. As such Horn was personally involved in creating and continuing DOC and City policies referenced herein, and was personally involved in training, supervision, and discipline of D.O.C. officers, including some of the individual defendants herein.

10.     Fidel Gonzalez ("Gonzalez") and Gregory McLaughlin ("McLaughlin") were, at relevant times from 2006 to 2008, Wardens in charge of RNDC. As such, they were personally involved in creating and continuing DOC and City policies referenced herein, and were personally involved in training, supervision, and discipline of D.O.C. officers, including some of the individual defendants herein.

11. Mark Scott ("Scott"), was at all times here relevant the Deputy Warden for Security at RNDC. As such, he was personally involved in training, supervision, and discipline of D.O.C. officers, including some of the individual defendants herein. Scott was also responsible for investigating and correcting systematic security problems at RNDC.

12. Patrick Walsh ("Walsh"), was at all times here relevant the Bureau Chief of Facility Operations for the New York City Department of Correction. As such, Walsh was responsible for the policy, practice, supervision, implementation, and conduct of all D.O.C. security matters. Horn and Walsh were regularly provided with reports of applications of force, allegations of unreported uses of force, and other breaches of security in DOC jails. In addition, at all relevant times, Horn and Walsh were responsible for enforcing the rules of D.O.C., and for ensuring that D.O.C. personnel obey the laws of the United States and of the State of New York.

13. All other individual defendants ("the officers"), were at all times relevant correction officers, captains, assistant deputy wardens, and deputy wardens employed by the D.O.C., and are sued in their individual capacities.

14. At all times here mentioned defendants were acting under color of state law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the City and State of New York.

## NOTICE OF CLAIM

15. In an order dated September 8, 2009, the Supreme Court of the State of New York, Hon. Larry S. Schachner, granted plaintiff's motion to file a late notice of claim against the City of New York in this matter. On October 21, 2009, plaintiff filed written notice of claim with the New York City Office of the Comptroller. Over 30 days have elapsed since the filing of that notice, and this matter has not been settled or otherwise disposed of.

## FACTUAL ALLEGATIONS

## THE ASSAULTS

16.  Plaintiff was a pre-trial detainee at the Robert N. Davornen Center ("RNDC"), a jail on Rikers Island. Upon his admission to RNDC, plaintiff quickly learned that inmates were in charge of enforcing rules and discipline in plaintiff's housing units. Plaintiff learned that the officers relied upon inmates to enforce discipline, and that the inmate enforcers were gang members who were paid in commissary and additional privileges by the officers. The officers themselves regularly used violence to enforce discipline in the housing areas, and they also directed and tolerated other inmates using violence to enforce discipline.

17.  On September 13, 2008, defendant Miller, a correction officer, hit plaintiff in the head with a plunger stick because he believed plaintiff was not behaving. That assault, witnessed by other correction officers, caused plaintiff serious injuries. Nevertheless, Miller and other officers coerced plaintiff into agreeing with a fabricated explanation of the events that led to the injuries, and denied plaintiff medical attention for a week to ensure that the injuries were not traceable to the officers when they finally were treated.

18.  On September 21, 2008, at least two of the officers, Nelson and McKie, formed an agreement with inmates to allow them to enter plaintiff's cell, and assault plaintiff. Plaintiff's injuries required plaintiff to be removed to Elmhurst Hospital, where he was treated for, among other injuries, an orbital fracture. The officers fabricated the cause of plaintiff's injuries in written reports.

19.  At all times during the events described above, the officers were engaged in a joint venture and formed an agreement with each other and with other inmates to violate plaintiff's constitutional rights. The individual officers assisted each other in performing the

4

various actions described and lent their physical presence and support and the authority of their office to each other during said events. They failed to intervene in the obviously illegal actions of their fellow officers and other inmates against plaintiff. They acted maliciously and with intent to injure plaintiff, and at best with deliberate indifference to a known threat of physical injury from other inmates. As a direct and proximate result of the acts of defendants, plaintiff suffered the following injuries and damages:

    a. Violation of his right to Due Process of Law under the Fourteenth Amendment to the United Stated Constitution;

    b. Violation of his right under the Fourth Amendment to the United States Constitution to be free from unreasonable seizures;

    c. Violation of his New York State Constitutional right under Article 1, Section 6 to Due Process of Law;

    d. Violation of his New York State Constitutional right under Article 1, Section 12, to be free from unreasonable searches and seizures;

    e. Physical pain and suffering;

    f. Emotional trauma and suffering, including fear, embarrassment, humiliation, emotional distress, frustration, extreme inconvenience, and anxiety.

    g. Lost future earnings.

## THE INCIDENT THAT (BRIEFLY) GOT THE CITY'S ATTENTION

20. On October 19, 2008, another inmate, Christopher Robinson, was allegedly beaten to death by other inmates at Rikers Island. An investigation into the matter resulted in an indictment of defendants McKie, Nelson, and Albright, filed in the Supreme Court of the State of

various actions described and lent their physical presence and support and the authority of their office to each other during said events. They failed to intervene in the obviously illegal actions of their fellow officers and other inmates against plaintiff. They acted maliciously and with intent to injure plaintiff, and at best with deliberate indifference to a known threat of physical injury from other inmates. As a direct and proximate result of the acts of defendants, plaintiff suffered the following injuries and damages:

    a. Violation of his right to Due Process of Law under the Fourteenth Amendment to the United Stated Constitution;

    b. Violation of his right under the Fourth Amendment to the United States Constitution to be free from unreasonable seizures;

    c. Violation of his New York State Constitutional right under Article 1, Section 6 to Due Process of Law;

    d. Violation of his New York State Constitutional right under Article 1, Section 12, to be free from unreasonable searches and seizures;

    e. Physical pain and suffering;

    f. Emotional trauma and suffering, including fear, embarrassment, humiliation, emotional distress, frustration, extreme inconvenience, and anxiety.

    g. Lost future earnings.

## THE INCIDENT THAT (BRIEFLY) GOT THE CITY'S ATTENTION

20. On October 19, 2008, another inmate, Christopher Robinson, was allegedly beaten to death by other inmates at Rikers Island. An investigation into the matter resulted in an indictment of defendants McKie, Nelson, and Albright, filed in the Supreme Court of the State of

New York, Bronx County, under indictment #313-2009, for gang assault, conspiracy, and corruption. The prosecution in that matter contends that McKie, Nelson, and Albright regularly used inmates as enforcers in the housing areas they guarded, participated in and encouraged and permitted physical beatings of inmates by other inmates, and filed false reports to conceal the causes of injuries to inmates. The prosecution in that matter contends that the scheme that McKie, Nelson and Albright participated in was called "the Program", and had a well developed inmate chain of command.

## THE CITY'S KNOWLEDGE OF OFFICER-SANCTIONED INMATE VIOLENCE AND FAILURES TO POLICE ITS EMPLOYEES

21.     The City of New York already had actual knowledge of the scheme that McKie, Nelson, and Albright were involved in, and the scheme was limited to neither the housing areas, nor the building where McKie, Nelson, and Albright worked. Rather, the City knew and should have known that correction officers throughout Rikers Island have been using inmates as discipliarians and enforcers for many years. On February 7, 2007, the City was served with an amended complaint in the case of Donald Jackson v. City of New York, et al, filed under docket number 04-CV-5799, in the United States District Court, Southern District of New York. That complaint alleged that an inmate who assaulted the plaintiff was acting as a disciplinarian for correction officers, and that such a scheme was common in City correctional facilities. The inmate who assaulted Donald Jackson testified under oath that he did so as an enforcer for correction officers. A deposition of an individual officer in the case corroborated that he knew that correction officers used inmates as enforcers. That officer, who was a probationary officer at the time of the incidents complained of, was fired. The case settled for $500,000.00, and was the subject of several detailed newspaper articles, including repeated articles by the Village Voice, which posed formal press inquiries to the New York City Department of Correction and

to Horn.

22. Other civil cases had also been filed against the City of New York and seriously litigated, involving serious injuries allegedly received at the hands of inmates acting with the complicity of correction officers. In 07-CV-8443, in the Southern District of New York, Camillo Douglas claimed serious injuries as a result of such a beating at RNDC. An amended complaint in that case was filed April 28, 2008.

23. On May 25, 2008, a correction officer named Lloyd Nicholson was indicted in New York State Supreme Court, Bronx County, under indictment #710-2008, on allegations he used inmates as disciplinarians and enforcers. Despite this arrest, however, the practices in question continued, with the City's knowledge. Any efforts the City took to eliminate the practices were largely ineffective and did not address the long standing deficiencies alleged here.

24. On February 13, 2008, the City of New York was sued in the United States District Court, Southern District of New York, docket number 08-CV-1509, Antonio Madera v. City of New York, et al. In that matter, Antonio Madera ("Madera"), sued at least two of the same correction officers as named in the present complaint, and alleged many of the same specifics as the present complaint: that correction officers conspired with inmates to assault Madera, that correction officers denied medical attention to Madera, and falsified official documents to conceal the source of Madera's injuries.

25. Defendant Mark Scott, the Deputy Warden for Security at RNDC during and prior to the events in question, himself was found previously, as a captain, to have to have used "used unnecessary force and impermissible force", and "submitted a false or misleading report", after an administrative trial. The administrative law judge in that trial wrote about "glaring differences between respondent Scott's account of his actions in his-use-of force report and his

7

conduct as captured on videotape. The tape shows Captain Scott, wielding a 36-inch wooden baton, lifting it overhead with one hand only, then striking straight down, as though he were spear fishing. The blow is repeated. Then Captain Scott, this time seen using both hands on the baton, strikes down yet again, butt end first, to where the inmate is sprawled across the bed and floor... The use of force proved here was brutal, and resulted in serious injury to the inmate... the captain... whose supervisory inadequacies not only failed to prevent the beating that occurred on November 4, 1997, but actually promoted it.". As a result, Scott was suspended for a period of days, then promoted up the chain of command until he was Deputy Warden for Security at the adolescent jail where plaintiff was assaulted.

## FIRST CAUSE OF ACTION
### (42 U.S.C. § 1983 AND CONSPIRACY)

26. The above paragraphs are here incorporated by reference.

27. The officers acted under color of law and conspired to deprive plaintiff of his civil, constitutional and statutory rights to be free from unreasonable seizure pursuant to the Fourth and Fourteenth Amendments to the United States Constitution, and are liable to plaintiff under 42 U.S.C. §§1983 and sections six and twelve, Article 1, of the New York State Constitution.

28. The officers formed agreements with each other and with inmates other than plaintiff to act in concert to inflict unconstitutional injuries on plaintiff, and the officers and the other inmates did overt acts in furtherance of that goal.

29. Plaintiff has been damaged as a result of defendants' wrongful acts.

## SECOND CAUSE OF ACTION
### (42 U.S.C. § 1983- MUNICIPAL AND SUPERVISORY LIABILITY)

30. The above paragraphs are here incorporated by reference.

31. The practice and custom of correction officers using inmates as enforcers and disciplinarians was so widespread as to have the force of law.

32. The City the Commissioner and the Warden failed to discipline, train, or supervise their correction officers regarding the use of inmates as enforcers. It was known 'to a moral certainty' that employees would encounter the temptation to use inmates as enforcers, such situations present correction officers with a difficult choice, the kind which training will make less difficult, there was a history of employees mishandling the situation, and the wrong choices by correction officers would frequently have resulted in the deprivation of a citizen's constitutional rights.

33. The City the Commissioner and the Warden knew that correction officers regularly used inmates as discipliarians and enforcers, and that such practices presented an imminent harm to plaintiff.

34. In addition to the above mentioned policy failures, The City, the Commissioner, and the Warden virtually never discipline officers for not reporting fellow officers' misconduct that they have observed, and they often fail to discipline officers for making false statements to disciplinary agencies.

35. The investigatory body responsible for monitoring officer behavior, the Inspector General's office, also wrongfully allows officers to write their own reports, rather than interviewing officers individually, whereas complaining inmates are interviewed in person for the same incidents. Such a practice allows officers to fabricate versions of events consistently with each other, a practice commonly known to officers as "writing with me". Standard practice for receiving inmate statements concerning the same incidents, however, consists of personal interviews with the inmates. This disparity in investagatory techniques results in officer

9

statements being far more consistent and uniform than inmate statements, and thus far more readily credited.

36. When correction officers are sued for injuries sustained by inmates as a result of violence, if there was no finding of wrongdoing by the officer by the City, the City has a policy of representing correction officers through Corporation Counsel instead of paying outside counsel. This means Corporation Counsel's duty to the individual officers prevents it from reporting problem officers to the Department of Correction. In addition, there is no formal reporting mechanism between the Comptroller's office and the Department of Correction regarding the financial losses to the City resulting from lawsuits related to officers' conduct. This is part of the "total disconnect" between the results of civil suits and individual officers' careers that have been very publicly observed, prior to the incidents in question, by former City Comptroller Alan Hevesi. The Association of the Bar of the City of New York, Committee on New York City Affairs, published a written report in 1990 recommending that the City create formal reporting mechanisms in cases of police abuse, and the recommendations and reasoning apply equally to suits against correction officers. No such reporting mechanisms had been created by the time of the incidents in question.

37. The above described policies and customs and failures to train, supervise, or discipline demonstrated a deliberate indifference on the part of policymakers of the City, Horn, Gonzalez, McLaughlin, Scott, and Walsh, to the constitutional rights of persons within New York City, and were the cause of the violations of plaintiff's damages.

### THIRD CAUSE OF ACTION
### (ASSAULT)

38. The above paragraphs are here incorporated by reference.

39. The officers made plaintiff fear for his physical well-being and safety and placed him in apprehension of immediate harmful and/or offensive touching.

40. The officers have deprived plaintiff of his civil, constitutional and statutory rights and have conspired to deprive him of such rights and are liable to plaintiff under common law, 42 USC §1983 and New York State laws and Constitution.

41. Plaintiff was damaged by the officers' assault.

### FOURTH CAUSE OF ACTION
### (BATTERY)

42. The above paragraphs are here incorporated by reference.

43. The officers formed an agreement with each other and with other inmates to engage in and subject plaintiff to immediate harmful and/or offensive touching and battered him.

44. The officers used excessive and unnecessary force with plaintiff.

45. The officers have deprived plaintiff of his civil, constitutional and statutory rights and have conspired to deprive him of such rights and are liable to plaintiffs under common law, 42 USC §1983 and the New York State Constitution.

46. Plaintiff was damaged by defendant's battery.

### FIFTH CAUSE OF ACTION
### (CONSTITUTIONAL TORT)

47. All preceding paragraphs are here incorporated by reference.

48. The officers formed an agreement with each other and with other inmates to act under color of law to violate plaintiff's rights pursuant to Article 1, §§6 and 12 of the New York State Constitution.

49. A damages remedy here is necessary to effectuate the purposes of Article 1, §§6 and 12 of the New York State Constitution, and appropriate to ensure full realization of

plaintiff's rights under those sections.

## SIXTH CAUSE OF ACTION
## (NEGLIGENT HIRING & RETENTION)

50. The above paragraphs are here incorporated by reference.

51. Defendants had a bad disposition and a propensity to use violence against inmates and employ other inmates as enforcers, to falsify and tolerate falsification of official reports, and the City knew or should have known of facts that would have led reasonable and prudent people to further investigate the defendants' bad dispositions through the hiring process.

52. The City knew or should have known that its failure to investigate the officers' bad dispositions would lead to plaintiff's injury.

53. The City was negligent in hiring and retaining the officers involved in this case in that it knew or should have known of the officers' propensity to use excessive force.

54. The City has deprived plaintiff of his civil, constitutional and statutory rights and has conspired to deprive him of such rights and are liable to plaintiffs under common law, 42 U.S.C. §1983 and the New York State Constitution.

55. The injury to plaintiff was caused by the officers' foreseeable use of excessive force and conspiracy with inmates to inflict harm on other inmates.

## SEVENTH CAUSE OF ACTION
## (RESPONDEAT SUPERIOR)

56. The above paragraphs are here incorporated by reference.

The defendants' tortious acts were undertaken within the scope of their employment by defendant City of New York and in furtherance of the defendant City of New York's interest.

57. As a result of defendants' tortious conduct in the course of their employment and

in furtherance of the business of defendant City of New York, plaintiff was damaged.

## NEGLIGENCE

58. The above paragraphs are here incorporated by reference.

59. The City owed plaintiff a duty of care for foreseeable risks of harm from other inmates and from correction officers.

60. The City knew and had reason to know that plaintiff faced a risk of harm from the inmates and correction officers who assaulted him. Nevertheless, the City failed to protect plaintiff from the inmates and correction officers who assaulted him.

61. One or more of the exceptions provided for in New York Civil Practice Laws and Rules § 1602 applies to this action.

62. Plaintiff was damaged by the City's negligence.

WHEREFORE, plaintiff demands judgment against the defendants, jointly and severally, as follows:

A. In favor of plaintiff in an amount to be determined by a jury for each of plaintiff's causes of action;

B. Awarding plaintiff punitive damages in an amount to be determined by a jury;

C. Awarding plaintiff reasonable attorneys' fees, costs and disbursements of this action; and

D. Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: Brooklyn, New York
December 10, 2009

TO: New York City Corporation Counsel
100 Church Street, 4th floor
New York, NY 10007

Commissioner Martin Horn

Fidel Gonzalez

Gregory McLaughlin

Mark Scott

Patrick Walsh

Michael McKie

Khalid Nelson

Denise Albright

Yours, etc.,

*/s/ Andrew Stoll*

Stoll, Glickman & Bellina, LLP
By: Andrew Stoll, AS 8808
Attorney for Plaintiff
71 Nevins Street
Brooklyn, NY 11217
(718) 852-3710
astoll@stollglickman.com